**ALLEN B. DUMONT LABORATORIES, Inc., Plaintiff,**

v.

**NATIONAL FACTORS, Inc., Defendant.**

Civ. No. 3552.

United States District Court
S. D. Ohio, W. D.

May 19, 1958.

William T. Bahlman, Jr., Paxton & Seasongood, Cincinnati, Ohio, for plaintiff.

Philip J. Schneider, Waite, Schindel, Bayless, & Schneider, Cincinnati, Ohio, for defendant.

DRUFFEL, District Judge.

### Findings of Fact

1. Plaintiff, Allen B. DuMont Laboratories, Inc., was at the time of the filing of this action and at all times material hereto, and still is, a corporation organized and existing under the laws of the State of Delaware and is a citizen of said state.

2. Defendant, National Factors, Inc., was at the time of filing of this action and at all times material hereto, and still is, a corporation organized and existing under the laws of the State of Ohio and is a citizen of said state. Its principal place of business is located in the City of Cincinnati, Hamilton County, Ohio, in the Southern District of Ohio and Western Division thereof.

3. The matter in controversy exceeds, exclusive of interest and costs, the sum of $3,000.

4. Plaintiff is and was at all times hereinafter referred to in the business, among other things, of manufacturing and selling television sets at wholesale.

5. Defendant is engaged in the financing business in Cincinnati, Columbus, and elsewhere, and is the wholly owned subsidiary of Welfare Finance Corporation, an Ohio corporation.

6. Mid-State Distributing Company (herein called "Mid-State") was an Ohio corporation, with its principal office and place of business located in Columbus,

16

Ohio, and until March of 1955 was engaged in the distribution at wholesale of various appliances to dealers.

7. Mid-State in July of 1954 was attempting to secure the franchise to distribute plaintiff's television sets to dealers. Mid-State's officers who were active in this endeavor were Albert F. Cameron, Jr., Treasurer and Stanley Paige, Secretary.

8. Mid-State applied to the defendant for financing in the operation of its business, and defendant insisted to Mid-State that Lawrence Warehouse Company establish on the premises of Mid-State a field warehouse for the storage and protection of merchandise shipped by manufacturers to Mid-State.

9. Defendant also insisted to Mid-State upon an agreement with Mid-State whereby all of Mid-State's accounts receivable were to be factored by defendant.

10. Mid-State, as depositor, entered into a field warehouse agreement, dated July 8, 1954, with Lawrence Warehouse Company (herein called "Lawrence"). July 12, 1954 the installation of the warehouse had been completed. This warehouse storage agreement provided Mid-State employed Lawrence to establish and operate a field warehouse in Columbus, Ohio, and agreed therein to lease to Lawrence adequate warehouse storage space therefor, and to pay Lawrence certain charges for the installation and operation of said storage warehouse. Lawrence was and is a corporation engaged in the business of operating field warehouses and issuing warehouse receipts for merchandise placed in such warehouses, with offices for its mid-continent division located at Chicago, Illinois.

11. Mid-State in July of 1954 had capital of only $10,000. Plaintiff was unwilling to franchise Mid-State as a distributor of plaintiff's television sets unless Mid-State was able to obtain outside financing. Mid-State told defendant that plaintiff was waiting a reply from Mid-State as to the decision of defendant on the application of Mid-State for warehouse and accounts receivable financing.

12. On July 20, 1954, defendant advised Mid-State that it was willing to enter into a financing agreement to cover the financing of DuMont products. Subsequently, on August 11, 1954, defendant and Mid-State executed two agreements, one of which related to the financing of Mid-State's inventory through warehouse receipts, and the other of which provided for the factoring by defendant of Mid-State's accounts receivable.

13. Under date of July 29, 1954 plaintiff appointed Mid-State the authorized exclusive distributor of plaintiff's television sets under terms defined in a written distributor franchise agreement.

14. On the same date Mid-State signed and forwarded to the plaintiff its written order for the purchase of 550 television sets on or before September 12, 1954.

15. Defendant was unwilling to finance Mid-State's inventory of television sets unless defendant had obtained from plaintiff a "repurchase agreement", which provided plaintiff was obligated to purchase from defendant television sets which defendant might have on its hands in event of default by Mid-State in repayment of sums advanced by defendant for the purchase of television sets from plaintiff. On August 13, 1954, defendant signed such a repurchase agreement and by letter requested that plaintiff also sign the agreement.

16. Before signing the repurchase agreement requested by defendant, plaintiff asked for and received a financial statement from defendant. Defendant on August 14, 1954, in compliance with plaintiff's request sent plaintiff the financial statement of its parent, Welfare Finance Corporation. In the letter forwarding its financial statement, defendant in turn requested a financial statement of plaintiff, and on August 18, 1954 plaintiff mailed to defendant a copy of its annual report.

17. On August 20, 1954, Paul Wieck, Credit Manager of plaintiff's Television Receiver Division, had a telephone conversation with William H. Bosse, Assistant Secretary of the defendant, who was authorized to act on behalf of defendant. Mr. Wieck advised Mr. Bosse that plaintiff wanted to and intended to bill defendant for merchandise shipped to Mid-State and that due to the poor financial condition of Mid-State, plaintiff could see no other way of shipping them. Mr. Bosse agreed to this method of billing and so advised Mr. Wieck. Mr. Wieck, contemporaneously and in the ordinary course of plaintiff's business prepared a written memorandum of this conversation directing that all bills for DuMont merchandise shipped to Mid-State should be invoiced to defendant in accordance with an agreement between defendant and Mid-State and that the merchandise should be shipped to Mid-State in Columbus. This memo was mimeographed and copies were circulated to plaintiff's personnel in charge of handling shipments of plaintiff's television sets to Mid-State.

18. On August 26, 1954, plaintiff returned to defendant the repurchase agreement duly signed by plaintiff. The repurchase agreement limited plaintiff's obligations to repurchase to a total of $30,000, but this sum was not a limitation on the amount of defendant's liability to plaintiff for television sets shipped to Mid-State.

19. On August 27, 1954, plaintiff made out an invoice for shipment of 103 television sets. This invoice stated at the top,

"Sold to National Factors Inc.
616 Walnut Street, Cincinnati 2, Ohio
Attn: Wm. H. Bosse"

"Ship to Mid State Dist.
82 N. Grant Avenue
Columbus, Ohio"

The amount of this invoice was $17,406.89, and the television sets referred to on this invoice were shipped by plaintiff to Mid-State.

20. The invoice was mailed to defendant and received by it, and no invoice was sent by plaintiff to Mid-State. Defendant on or about September 1, 1954, learned that no copy of it had been mailed to Mid-State.

21. On or about September 1, 1954, Mr. Bosse of defendant called Mid-State to inquire as to the whereabouts of the warehouse receipt to be issued by Lawrence covering the television sets shipped on plaintiff's invoice of August 27, 1954. Mr. Cameron of Mid-State told Mr. Bosse that the warehouse receipt could not be prepared since no copy of the invoice had been sent to Columbus and it was impossible to compute the values to be assigned on each warehouse receipt to each television set without a copy of the invoice, which showed excise taxes and other items which had to be prorated among the television sets.

22. September 3, 1954, Mid-State wrote to plaintiff, advising that it had asked Mr. Bosse to send a duplicate copy of the invoice to Mid-State so that the warehouse receipt could be prepared, and requested that in the future duplicate copies of each invoice be sent to Mid-State for this purpose.

23. September 3, 1954, Mr. Wieck, in the ordinary course of business, prepared and circulated a memorandum to DuMont personnel advising that the necessary signatures had been obtained to enable DuMont to finance Mid-State through defendant, that the agreement was with defendant and that for the protection of plaintiff it was imperative that billings should be made to defendant; and that shipments should go to Mid-State.

24. After receiving Mid-State's letter of September 3, Mr. A. G. Evans, Assistant General Sales Manager of plaintiff, talked over the telephone with Mr. Bosse of Defendant, some time prior to September 13. Mr. Evans asked Mr. Bosse why copies of plaintiff's invoices were wanted in Columbus, and Mr. Bosse stated that copies were to be used in connection with the preparation of warehouse

receipts and Mr. Bosse requested that copies of plaintiff's invoices be sent to Columbus for this purpose.

25. Plaintiff was not concerned with nor did it have anything to do with the issuance of the warehouse receipts by Lawrence to defendant as warehouse receipt holder, but as an accommodation to defendant it agreed to mail copies of its subsequent invoices to Mid-State to assist in the preparation of warehouse receipts. The original of all invoices concerned in this action were mailed to defendant, and copies were furnished to Mid-State only for the purpose of information and assistance in preparation of warehouse receipts.

26. The following is a record of thirteen (13) shipments of television sets made by plaintiff to Mid-State. In each case invoices therefor were sent by plaintiff to defendant on the dates shown and were received by defendant in due course of the mails, and all such invoices were made out in the manner stated in Paragraph 19 hereof:

Invoices

| Shipments | Date | No. of Invoice | Number of Tele-sets | Amount of Invoice |
|---|---|---|---|---|
| | 1954 | | | |
| 1 | Aug. 27 | 804236 | 103 | $17,406.89 |
| 2 | Sept. 10 | 804812 | 104 | 16,677.52 |
| 3 | Oct. 6 | 805768 | 90 | 15,932.15 |
| 4 | Oct. 13 | 806255 | 133 | 22,967.50 |
| 5 | Oct. 29 | 806838 | 99 | 16,565.06 |
| 6 | Nov. 12 | 807750 | 61 | 11,507.18 |
| 7 | Nov. 16 | 807835 | 67 | 12,718.16 |
| 8 | Nov. 17 | 807852 | 52 | 7,743.47 |
| 9 | Nov. 18 | 807909 | 64 | 12,172.80 |
| 10 | Dec. 6 | 808736 | 58 | 10,256.63 |
| 11 | Dec. 22 | 809507 | 104 | 17,963.30 |
| 12 | Dec. 28 | 809647 | 1 | 715.27 |
| | 1955 | | | |
| 13 | Jan. 14 | 810676 | 68 | 11,714.13 |

27. Plaintiff has received payment in full on the first seven shipments of television sets, of the total invoice price of $113,774.46, covering 657 television sets. Payments of each of these seven invoices were mailed to the plaintiff by the defendant, which sent to plaintiff its own check for 85% of the amount of each invoice, together with a check of Mid-State, for the balance.

28. The dates of the payments made by defendant to plaintiff on each of the shipments are as follows:

| Shipments | Invoice No. | Date |
|---|---|---|
| 1 | 804236 | Sept. 14–1954 |
| 2 | 804812 | Oct. 8 |
| 3 | 805768 | Nov. 4 |
| 4 | 806255 | Nov. 16 |
| 5 | 806838 | Dec. 2 |
| 6 | 807750 | Dec. 10 |
| 7 | 807835 | Jan. 7–1955 |

29. Shipments of television sets were made by plaintiff to Mid-State in accordance with a dealers quota arrangement; a specific quota being assigned quarterly by plaintiff to its individual dealers. Mid-State executed its quota sheets on July 29, 1954 for 550 television sets, on September 27, 1954, for 707 television sets and in December, 1954, for 433 television sets. Only 1004 television sets were shipped by plaintiff to Columbus and invoiced to defendant. Each quota, accepted by Mid-State, constituted an order therefor from Mid-State to plaintiff. Plaintiff never submitted to defendant any such quota, and defendant was not requested, either by plaintiff or Mid-State, to sign, countersign, agree to or approve any such quota. Plaintiff shipped television sets to Mid-State on the basis of the quota sheets signed by Mid-State.

30. Plaintiff's books charged defendant as account debtor at the time each of the thirteen (13) shipments of television sets was made. Plaintiff at the same time carried a separate account for Mid-State to which was charged Mid-State's open account purchases of television sets and parts therefor.

31. Defendant and Mid-State set up a system for processing of television sets upon their arrival at Mid-State's premises. The system was that upon receipt of a shipment in Columbus, the television sets would be placed in the field warehouse of Lawrence and Lawrence would issue warehouse receipts to defendant, equal in face amount to the total of plaintiff's invoice. Mid-State would forward its check for 15% of the amount of the warehouse receipt to defendant. Before any television sets could be released from the warehouse and disposed of by Mid-State, Mid-State was to prepare a release form for defendant's signature, showing the value as per warehouse receipt of the merchandise to be released, together with Mid-State's check for 85% of such amount.

32. About December 15, 1954, defendant discovered that television sets had been released from the warehouse without its authorization and without having been paid therefor. The effect of the improper releases created a shortage of television sets in the field warehouse of the declared value of $28,000. Defendant held outstanding warehouse receipts for television sets of this value which Lawrence was unable to deliver because of the improper release thereof.

33. Defendant did not advise plaintiff that these irregularities had been discovered or that there was a shortage in the warehouse.

34. Lawrence at some time between December 22, 1954 and January 2, 1955 padlocked the warehouse on Mid-State's premises so no merchandise could be placed therein or removed therefrom. Defendant learned of this as soon as it was done, but defendant did not advise plaintiff thereof.

35. On December 21, 1954 plaintiff wrote defendant and asked defendant to advise plaintiff of "the amount presently owing to your bank" under the repurchase agreement referred to in paragraph 15 hereof, "to assist us in determining the extent of our repurchase agreement liability with your bank for Mid-State Distributing Company". Plaintiff was asked that this information be furnished shortly after the first of each month in the future. Defendant made no reply of any kind to this letter, although it was defendant's custom to reply to such letters.

36. Defendant on January 7, 1955, forwarded checks in payment of plaintiff's invoice #807835, which was paid in the same manner as the previous six invoices, without comment and apparently in due course.

37. As a result of a telephone call from Mr. Stanley Paige, Mr. Wieck and Mr. Evans came on February 2, 1955 to the office of defendant in Cincinnati, where they conferred with defendant's officers, Roy Hummel, Assistant Secretary, Mr. Bosse and Mr. Whitehead, Assistant Secretary and defendant's Field Auditor. Mr. Hummel had principal

charge and these other personnel of the defendant participated in the course of dealing of defendant with plaintiff and Mid-State.

38. Plaintiff first learned of the irregularities in Columbus on this date, and defendant's representatives assured plaintiff that Mid-State was solvent. Plaintiff made no shipment to Mid-State after January 14, 1955.

39. The conference continued in Columbus at Mid-State's premises on the next day. Mr. Wieck inquired as to payment of its invoice #807909, and Mr. Whitehead, after telephoning defendant's office in Cincinnati, stated that this invoice was being processed and that plaintiff would receive its remittance. This remittance was never made.

40. Plaintiff with the knowledge and acquiescence of defendant, repossessed certain television sets from the premises of Mid-State in Columbus on February 4, 1955. Credits were duly issued by plaintiff to defendant for the invoice price of the television sets so repossessed, amounting to $25,059.05.

41. On March 11, 1955, an involuntary petition in bankruptcy was filed against Mid-State, and Mid-State was adjudged a bankrupt on April 7, 1955.

42. From the first shipment of August 24, 1954 until the collapse of Mid-State in February, 1955, defendant did not object to plaintiff that it was being invoiced for the television sets shipped by plaintiff.

43. Defendant knew that plaintiff was relying on its credit in making shipments of television sets, and that plaintiff not only was not relying on the credit of Mid-State but believed its capital to be inadequate and its credit unreliable.

44. Plaintiff and defendant did not ever agree on a dollar amount which would be the limit of credit to be extended by defendant for television sets shipped by plaintiff. Defendant was fully informed of the nature and extent of its liability by the orginal invoices for each shipment of television sets which plaintiff sent to defendant.

45. From late January 1955 until May 26, 1955, the field warehouse on the premises of Mid-State was padlocked, and no television sets were removed therefrom except 141 sets which were repossessed by plaintiff on February 4, 1955, as heretofore stated in Paragraph 40.

46. On February 24, 1955 plaintiff secured permission from Lawrence to enter the warehouse and made an inventory by physical count of television sets in the warehouse. Plaintiff also recorded the serial numbers of each television set and the invoices on which each set was shipped.

47. Of the 111 television sets in the warehouse on February 24, 1955, 30 sets were shipped on invoices for which plaintiff to date has not been paid. One of these sets had been shipped on plaintiff's invoice 807852 of November 17, 1954, 16 of these had been shipped on plaintiff's invoice 807909 of November 18, 1954, 5 of these had been shipped on plaintiff's invoice 808736 of December 6, 1954, 7 of these had been shipped on plaintiff's invoice 809507 of December 22, 1954, and one (1) of these had been shipped on plaintiff's invoice 810676 of January 14, 1955. The total invoice price of these 30 sets was $5,522.22.

48. On May 26, 1955 defendant knew that the warehouse contained television sets which were not identified with any warehouse receipt and for which plaintiff had not been paid. Lawrence also knew that the warehouse contained television sets which were not identified with any receipt.

49. Beginning in December of 1954 and through May of 1955, defendant and Lawrence cooperated in a full investigation of the warehouse inventory, the extent of outstanding warehouse receipts of which defendant was the holder, the history of releases of television sets from the warehouse, and defendant demanded of Lawrence that the merchandise on outstanding warehouse receipts be turned over to it. This demand was made March 11, 1955 at a conference in Columbus, at

which Mr. Charles O. Butler, Vice President and General Counsel of Lawrence, represented Lawrence.

50. On May 10, 1955, defendant filed with the Honorable Gail Butt, Referee in Bankruptcy for the United States District Court for the Southern District of Ohio, Eastern Division, its petition for an Order directing the Trustee in Bankruptcy of Mid-State to disclaim certain property, including certain television sets listed therein.

51. The said petition listed the television sets, shipped by plaintiff and invoiced to defendant, which had been under padlock in the warehouse of Mid-State's premises since the end of January, 1955.

52. Also listed in this application were seven (7) television sets which had not been carried in the inventory made on behalf of the plaintiff on February 24, 1955. These seven (7) additional sets were sets returned in March of 1955 by dealers to whom they had been delivered by Mid-State.

53. The said petition, signed under oath by Richard F. Whitehead, Assistant Secretary of defendant, stated that, with respect to all of the television sets listed in said petition, the ownership was in defendant and that Mid-State did not then and never had had title thereto. This petition was prepared by defendant's counsel in Columbus in consultation with counsel for Lawrence and Mr. Whitehead.

54. On May 24, 1955, as a result of the said petition, the Referee in Bankruptcy entered an Order directing that the Trustee in Bankruptcy of Mid-State disclaim title thereto and that the said property should be released to defendant.

55. On May 26, 1955 defendant signed and delivered to Lawrence receipts for the television sets then in the warehouse. These receipts listed by quantity and model the television sets to which defendant claimed title. One hundred and twenty three (123) sets were included, among them being the 111 television sets inventoried by plaintiff on February 24, 1955 and the 118 television sets listed in the petition to the Bankruptcy Referee filed May 10, 1955. 43 of these sets had never been placed under warehouse receipt.

56. The receipt given by defendant to Lawrence states that television sets were included thereon which were not under warehouse receipt.

57. Defendant disposed by sale of the television sets released from the warehouse on May 26, 1955 and received the proceeds of such sale.

58. Of the 206 television sets, the purchase price of which has not been paid to plaintiff, at least 43 were included among those released from the warehouse on May 26, 1955. One hundred and forty three (143) of these sets were disposed of by dealers, and the proceeds of these sales, amounting to $23,666.23, were received by defendant under its factoring agreement with Mid-State.

59. The proceeds of these sales were assigned to defendant from time to time between November 24, 1954 and February 14, 1955, and defendant knew or should have known that it was receiving proceeds from television sets which had not been warehoused according to its records and for the price of which plaintiff had not been paid. Among these sets were 34 on plaintiff's invoice of November 17, 1954, 19 from its invoice of November 18, 1954, 30 from its invoice of December 6, 1954, 50 from its invoice of December 22, 1954 and 7 from its invoice of January 14, 1955.

60. Defendant exercised complete dominion over the television sets shipped by plaintiff and for which defendant was invoiced, and treated the television sets as its property. Mid-State had no title to the television sets shipped to it except to the extent that defendant or Lawrence permitted Mid-State to deal with them as its own.

61. Defendant is estopped by its conduct and representations from denying that title to the television sets shipped by plaintiff passed to it, or that it is in-

debted to the plaintiff in the amount of $35,677.19.

62. Each 28 days beginning at the end of August, 1954, and through February of 1955, plaintiff invoiced defendant showing the total balance due on all shipments unpaid to the date of such statement. Defendant received these invoices and did not object to plaintiff that the invoices were sent to defendant nor as to the amount shown due on any of them, until after it was apparent that Mid-State was insolvent.

63. All of plaintiff's invoices were due and payable on the dates stated on the respective invoice.

64. The defendant is indebted to the plaintiff in the sum of $35,677.19, with interest at the rate of 6% per annum from February 23, 1955.

Conclusions of Law

Upon the basis of the facts in this case the Court concludes:

1. The Court has jurisdiction over the parties and the subject matter of this action.

2. Plaintiff's exhibits 250 and 251 are relevant, admissable and are admitted in evidence.

3. Title to the television sets shipped by plaintiff to Mid-State and invoiced to defendant, passed to defendant upon delivery of the television sets to the carrier or to Mid-State.

4. Defendant assumed the obligation to pay to plaintiff the purchase price of television sets shipped to Mid-State.

5. Defendant is estopped by its conduct and representations from denying that title to the television sets passed to it, or that it is indebted to the plaintiff in the amount of $35,677.19.

6. The plaintiff is not precluded from recovering against defendant in this action by the statute of frauds.

7. Plaintiff is entitled to judgment against defendant in the amount of $35,-677.19, with interest at the rate of 6% per annum from February 23, 1955, and for its costs.